

June 22, 2026

>    *Re:*     *UFCW v. New York Presbyterian, 25-cv-5023, 25-cv-5571 (E.D.N.Y).*
>              *Pre-Motion Letter re NYP's Anticipated Motion to Dismiss.*

Dear Judge Cogan,

We write to request a pre-motion conference regarding NYP's anticipated motion to dismiss. The motion turns on a core point: the plaintiff unions are the wrong parties to sue. They lack standing under *Associated General Contractors* and are barred as indirect purchasers under *Illinois Brick*. Their claims also fail because the conduct alleged – NYP's negotiations for in-network inclusion in insurers' health plans – is neither exclusionary nor anticompetitive. As the Supreme Court said in *Ohio v. American Express Co.*, 585 U.S. 529, 551 (2018), "***there is nothing inherently anticompetitive about … anti-steering provisions***." The unions' failure to allege market power, exclusivity, tying, bundling, or rival foreclosure dooms their claims.

*Factual Background.* Just five insurance companies "account for a dominant majority of commercial health insurance business in New York City." Cmplt. ¶ 85. They "assemble provider networks" to offer health plans to employers, unions, and individuals. *Id*. ¶ 2.

A central feature of these plans is the distinction between "in-network" and "out-of-network" providers. *Id*. ¶ 5. What separates them is a complex array of financial incentives and penalties – exclusions, deductibles, co-pays, and co-insurance – insurers deploy to "steer" patients towards in-network and away from out-of-network providers. *Id*. ¶ 59. Because "going to an out-of-network provider" means "higher costs," "most members … choose to see in-network providers." *Id*. ¶¶ 5, 46. That power to steer is at the heart of this case. Insurers wield it, and the "*threat* of being excluded from insurance networks," to force providers like NYP to offer a "substantial reduction on price" for in-network status. *Id*. ¶¶ 5, 58.

For years, NYP successfully negotiated for network status. The unions now challenge that effort. They claim NYP's contracts – ***to which they are not a party*** – improperly designate NYP as "in-network" for "nearly all" plans. *Id*. ¶ 2. But the challenged provisions are inclusionary, not exclusionary. They prevent discrimination—insurers agree for the life of the contract not to penalize patients who choose NYP. When NYP negotiates for in-network status, the result is an **open network** that **maximizes** patient choice and does not exclude *anyone* from any plan.

The unions agree. They do not claim that NYP's contracts *exclude* any competing hospital. They do not say NYP restricts insurers' ability to designate other providers as in-network, or that NYP receives more favorable treatment than others. Nor do they allege that any competing hospital has been foreclosed from any relevant market.

The unions merely allege that "selective" networks – those that **discriminate** against NYP and **restrict** choice by penalizing patients who use NYP – are preferable. They believe the antitrust laws should bar NYP from obtaining in-network status in all insurer plans because "as a practical matter," these network placement provisions prevent *other providers* from paying insurers to steer patients away from NYP. Cmplt. ¶ 15. If other hospitals could pay for NYP's exclusion, "*insurance* companies," they say, "would create provider networks" more to their liking. *Id*. ¶ 3.



That the unions want selective, restricted-choice networks is irrelevant. The insurers *chose* broader, open-access networks. The unions are not parties to those design contracts. They allege no restraint on their own freedom of contract. Nor is network design their domain. "Self-funded payors do not assemble their own … networks" and lack the "scale and technical knowledge" to do so. *Id*. ¶¶ 47-48. Insurers – not unions – negotiate **both** the challenged network placement provisions and the volume discounts offered as consideration. The unions have no seat at the table. Nor do they earn one by asserting that the five **dominant** insurers are too weak or naïve to negotiate provisions "in the insurance companies' interests." *Id*. ¶ 155. The unions are not better stewards of those interests. It is "impossible," as they concede, to give every employer veto power over the network contracts insurers negotiate. *Id*. ¶ 47. The judiciary should not mandate that impossibility.

*The Unions Are Too Remote to Interfere with Insurer-Provider Negotiations*. The unions claim they ultimately paid for the services NYP provided to patients. But even so, they lack *standing*. They are too far removed from the challenged negotiations. When a consumer buys a Tesla, he cannot sue Goodyear because Tesla negotiated a volume discount to place Goodyear tires on every model, claiming it should have offered a Michelin option instead. The challenged negotiation is upstream; the consumer did not negotiate it, was not constrained by it, and was not the first supposed "victim." So too here. The challenged provisions merely affect the types of plans *insurers* offer. That is not enough. *Assoc. Gen. Contractors v. Carpenters*, 459 U.S. 519, 535 (1983); *see also IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 2017 WL 6557482 (E.D.N.Y. 2017) (Cogan, J.), *aff'd as relevant*, 924 F.3d 57, 67 (2d Cir. 2019) (distributor lacked standing where boycott foreclosed online portal the distributor used to sell products directly to providers); *In re Amex Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 140 (2d Cir. 2021) (citing *IQ* and noting "**our court has repeatedly followed the first-step rule in the antitrust context**.").

*The Unions' Claims Are Barred by Illinois Brick*. Because *Illinois Brick* permits only *one* claimant per distribution chain, this case can only proceed by stripping insurers of their cause of action. No court has done that. The unions concede they have no contract with NYP and have not paid a penny to NYP. They reimburse the *insurer* for their *portion* of any care NYP provides under NYP's *patient* and *insurer* contracts, and the insurer then "transmits" those proceeds to NYP. Cmplt. ¶ 51. That reimbursement obligation arises not from any NYP contract, but from the unions' own contracts with employers, employees, and insurers.

They are indirect purchasers. The unions answer that they are "financially responsible" for treatments *patients* purchase and receive from NYP. *Id*. ¶ 52. But that is a *legal* conclusion; it does not convert them into "direct purchasers" under *Illinois Brick*. *Apple Inc. v. Pepper*, 587 U.S. 273, 282 (2019) (a purchaser may sue *only* "when there is no intermediary."). At most, the unions seek an exception to *Illinois Brick* for *indirect* claims by asserting 100% pass-through. But they don't *actually* allege 100% pass-through. Nor could they, because insurers allocate a significant portion of the contracted costs – not to the unions – but to patients through policy exclusions, deductibles, co-pays, and co-insurance.

Even aside from that, the unions cannot satisfy the "fixed-quantity, cost-plus" exception to *Illinois Brick*. "Even if one hundred percent of the [costs] were passed on," an indirect purchaser "would still lack antitrust standing" if **any** competitive decisions – including price **or** quantity – rest with the intermediary. *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 291-92 (2d Cir. 2006); *Simon v. KeySpan Corp.*, 694 F.3d 196, 202-04 (2d Cir. 2012) (exception inapplicable where direct purchaser could vary "quantity" and thus suffer a loss). Here, it is the



insurers' contracting flexibility – not the unions' – that was allegedly restrained; rates are dictated by insurers, not unions; and quantity is not fixed by unions' advance purchase commitments, but by insurer's network-design and steering decisions, and ultimately, by patient choice.

> ***The Unions Fail to Allege Market Power.*** The unions concede that this is a vertical non-price case governed by the rule of reason, for which they must plausibly allege market power. They have not done so. They argue that "judgment may be entered … without precisely defining the particular markets that NYP's conduct has harmed or demonstrating NYP's market power in those markets." Cmplt. ¶ 130. That is not the law. *See Amex*, 585 U.S. at 543 n.7 ("direct effects" do not supplant the need to show market power in a vertical anti-steering case).

> Nor do the unions allege substantial or problematic market shares. Setting aside other defects with their alleged markets, they concede NYP has "less than 50% market share." Cmplt. ¶¶ 148, 185. In fact, they allege no specific share in their alleged primary market, New York City. At most, they reference the DOJ's allegation that NYP has between 25% and 30% share in certain boroughs. *Id*. ¶ 165. That does not plausibly allege market power. *New York v. Anheuser–Busch, Inc.*, 811 F. Supp. 848, 873 (E.D.N.Y. 1993) (in context of vertical restraint, a "39% share is below that which has been deemed sufficient to confer market power in any previous decision").

> ***The Unions Fail to Allege Exclusionary Contracts***. The unions challenge provisions designating NYP as in-network for "nearly all" insurer plans in exchange for rate concessions. That is simply a volume discount, and part of the Managed Care Bargain that the unions concede is procompetitive. It is the opposite of a restraint. The unions say so: the "All Products Clause" stops rivals – like NYU and Mount Sinai – from paying insurers for exclusivity in selective, restricted-choice networks that exclude NYP. But NYP can certainly offer discounts to *avoid* being *excluded*. When NYP negotiates for *inclusion*, the result is an open network that maximizes patient choice and excludes no one. At most, the unions say insurers value NYP differently across their plans: for some, they want NYP; for others, less so. But that is why firms offer volume discounts. A buyer buys more when offered larger discounts, even though he values the last unit less than the first. It is the economic law of diminishing *demand*; it is not illegal. Antitrust law already has tests for tying, bundling, and exclusive dealing that distinguish lawful volume discounts from other forms of predatory or anticompetitive behavior. The unions plead none of them. That kills their claim.

> ***The Unions Fail to Allege Rival Foreclosure***. The antitrust laws are not price regulation statutes. They do not dictate the amount or the form of pricing discounts. They prohibit conduct that ***excludes*** rivals from the market. The unions do not allege such foreclosure. They do not claim that NYP's in-network status caused hospitals to exit the market, prevented their entry, or deprived them of scale economies. They claim only that NYP charges too much and that insurers would offer different network configurations but for their decision to include NYP as an in-network provider. But NYP does not compete with insurers or unions and has not foreclosed anyone from anything. That too is fatal. *Roland Mach. Co. v. Dresser Indus., Inc*., 749 F.2d 380, 394 (7th Cir. 1984) (Posner, J.) (conduct not exclusionary unless it "is likely to keep at least one significant competitor ... from doing business in a relevant market").

Respectfully submitted,

/s *Colin R. Kass*