**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UFCW LOCAL 1500 WELFARE FUND and CEMENT AND CONCRETE WORKERS DC BENEFIT FUND, et al. | 25-cv-05023-BMC<br>25-cv-05571-BMC |
| Plaintiffs, | Hon. Brian M. Cogan, USDJ |
| v. | |
| THE NEW YORK AND PRESBYTERIAN HOSPITAL, | |
| Defendant. | |

**<u>NYP'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................... 1

II. THE UNIONS ARE TOO REMOTE TO CHALLENGE NYP'S NETWORK PARTICIPATION AGREEMENTS. ................................................................... 3

    A. The Unions Do Not Defend Their Injunctive Relief Claims. .................................. 4

    B. The Unions Are Too Remote to Sue for Damages. ................................................. 5

III. ILLINOIS BRICK BARS THE UNIONS' DAMAGES CLAIMS .................................... 9

IV. THE UNIONS FAIL TO ALLEGE MARKET POWER. .................................................. 13

V. THE UNIONS FAIL TO ALLEGE EXCLUSIONARY CONDUCT ............................. 16

    A. NYP Is Allowed to Seek Inclusion in Insurers' Networks. ................................... 17

    B. The Unions Failed to Allege the Elements of the Anticompetitive Conduct Tests Governing NYP's Volume Discounts. ........................................................ 18

VI. THE UNIONS FAILED TO ALLEGE COMPETITOR FORECLOSURE ...................... 22

VII. CONCLUSION ............................................................................................................. 26

# TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. Pepper*,
    587 U.S. 273 (2019) .............................................................................. passim

*Barry Wright Corp. v. ITT Grinnell Corp.*,
    724 F.2d 227 (1st Cir. 1983) ...............................................................25

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ...............................................................................24

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
    479 U.S. 104 (1986) ...............................................................................17

*Cascade Health Sols. v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) ..........................................................20, 22

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
    111 F.4th 337 (4th Cir. 2024) ...............................................................19

*Eisai, Inc. v. Sanofi Aventis U.S.*,
    LLC, 821 F.3d 394 (3d Cir. 2016) .......................................................20

*Elec. Med. Tr. v. U.S. Anesthesia Partners, Inc.*,
    2024 WL 5274650 (S.D. Tex. 2024) ....................................................12

*FTC v. Deere & Co.*,
    2025 WL 1638474 (N.D. Il. 2025) .......................................................19

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) .............................................................................. *passim*

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
    19 F.4th 127 (2d Cir. 2021) ..............................................................3, 5

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009) .............................................................8, 10

*In re EpiPen Antitrust Litig.*,
    44 F.4th 959 (10th Cir. 2022) .....................................................19, 20, 22

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
    533 F.3d 1 (1st Cir. 2008) ......................................................................12

*In re NorthShore University HealthSystem Antitrust Litig.*,
    2018 WL2383098 (N.D. Ill. 2018) ..................................................11, 12

*In re Payment Card Interchange Fee Antitrust Litig.*,
714 F. Supp. 3d 65 (E.D.N.Y. 2024) ...................................................................16

*In re Xyrem Antitrust Litig.*,
2024 WL 4023561 (N.D. Cal. 2024) ......................................................................9

*Info. Res., Inc. v. Dun & Bradstreet Corp.*,
359 F. Supp. 2d 307 (S.D.N.Y. 2004)....................................................................21

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
924 F.3d 57 (2d Cir. 2019)......................................................................................3

*Kansas v. UtiliCorp United, Inc.*,
497 U.S. 199 (1990)...............................................................................................12

*Loeb Industries, Inc. v. Sumitomo Corp.*,
306 F.3d 469 (7th Cir. 2002)..................................................................................10

*McCarthy v. Recordex Serv. Inc.*,
80 F.3d 842 (3d Cir. 1996).....................................................................................12

*McWane v. FTC*,
783 F.3d 814 (11th Cir. 2015) ...............................................................................25

*Med. Ctr. at Elizabeth Place, LLC v. Premier Health Partners*,
2017 WL 3433131 (S.D. Ohio 2017).....................................................................16

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
2026 WL 1397077 (2d Cir. 2026)..........................................................................14

*Ohio v. American Express Co.*,
585 U.S. 529 (2018).......................................................................................... *passim*

*Ortho Diagnostic Sys., Inc. v. Abbott Lab'ys, Inc.*,
920 F. Supp. 455 (S.D.N.Y. 1996).................................................................20, 24

*Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*,
555 U.S. 438 (2009)........................................................................................20, 22

*Paddock Publ'ns, Inc. v. Chicago Trib. Co.*,
103 F.3d 42 (7th Cir. 1996) (Easterbrook, J.)......................................................25

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
614 F.3d 57 (3d Cir. 2010).....................................................................................25

*Ramallo Bros. Printing, Inc. v. El Dia, Inc.*,
392 F. Supp. 2d 118 (D.P.R. 2005).......................................................................24

*Roland Mach. Co. v. Dresser Indus., Inc.*,
   749 F.2d 380 (7th Cir. 1984) (Posner, J.) ...................................................................24

*Sanderson v. Culligan Int'l Co.*,
   415 F.3d 620 (7th Cir. 2005) ........................................................................................22

*Schachar v. Am. Acad. of Ophthalmology, Inc.*,
   870 F.2d 397 (7th Cir. 1989) (Easterbrook, J.)........................................................22, 24, 26

*Simon v. KeySpan Corp.*,
   694 F.3d 196 (2d Cir. 2012)..........................................................................................12

*U.S. v. Anthem, Inc.*,
   236 F. Supp. 3d 171 (D.D.C. 2017) ................................................................................7

*U.S. v. Charlotte-Mecklenburg Hosp. Auth. ("Atrium")*,
   248 F. Supp. 3d 720 (W.D.N.C. 2017) .......................................................................21, 22

*U.S. v. Live Nation Ent., Inc.*,
   2025 WL 835961 (S.D.N.Y. 2025)...............................................................................8, 10

*U.S. v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001).........................................................................................22

*U.S. v. Syufy Enters.*,
   903 F.2d 659 (9th Cir. 1990) .........................................................................................15

*U.S. v. Visa U.S.A., Inc.*,
   344 F.3d 229 (2d Cir. 2003)..........................................................................................16

*Uriel Pharm. Health & Welfare Plan v. Advoc. Aurora Health, Inc.*,
   2023 WL 12284689 (E.D. Wis. 2023)........................................................................10, 21, 22

**STATUTES**

15 U.S.C. § 1...................................................................................................... *passim*

15 U.S.C. § 12, *seq. et.*........................................................................................................4

**OTHER AUTHORITIES**

Easterbrook, *Vertical Arrangements and the Rule of Reason*,

   53 Antitrust L.J. 135 (1984)..........................................................................................13

# I.   INTRODUCTION.[1]

Every network needs a designer.  Insurers design theirs – they build the roster, negotiate the rates, and sell the plans.  The unions did none of that, yet they have sued to seize control of the process, asking this Court to override contracts they never signed.  The Sherman Act does not hand them a veto.  But even if they could step into the insurers' shoes, they have nothing to complain about.  They bring an exclusion case with no exclusion, a restraint case with no restraint.

*The Unions Are Too Remote*.  NYP contracts with insurers and patients to provide care to those who want it at discounted rates.  In doing so, NYP strives to be included as an in-network provider on insurers' rosters – a designation that benefits patients by ensuring their care is covered, a critical consideration when seeking life-saving, but often expensive care.  The unions claim that insurers should be barred from including NYP in "all" their plans and forced, *by this lawsuit*, to create "selective" networks that restrict patients' choices and, in the unions' words, "yes, to … discriminate" against NYP.  But the unions are not "efficient antitrust enforcers."

Their purported injury – the inability to subscribe to plans with different providers and benefits offered *by insurers* – does not even occur in the alleged *hospital* market; it arises in the insurance market.  That injury is indirect, and insurers are fully capable of vindicating whatever limits the Sherman Act places on their negotiations with NYP.

The unions do not dispute that they are too remote to interfere with insurers' negotiations through injunctive relief, limiting their defense to standing for damages.  But they cannot recover damages flowing from provisions they have no right to enjoin.  Because their damages pass

---

[1] Unless otherwise noted, all emphasis added, internal citations and quotation marks omitted, and capitalizations and punctuation conformed.

through two contracts – NYP's contracts with insurers, and insurers' contracts with them – they are at least two steps removed in the causal chain.  That is one too many.

*Illinois Brick Bars the Unions' Claims*.  *Illinois Brick* establishes a "bright line" rule of privity, preventing suit by indirect purchasers.  The unions concede they lack privity.  That ends the inquiry.  So instead, they ask the Court to cross that line in favor of bank account tracing, stripping insurers of their claim and handing it to them.  The Supreme Court rejected that fuzzy approach in *Apple v. Pepper*.  Nor does the unions' web of contracts with employers, employees, and insurers – **but not NYP** – obligating them to cover members' healthcare expenses make them direct purchasers.  In fact, they are not "purchasers" at all.  If a patient with a 20% co-insurance obligation receives ten stitches, the unions do not buy eight of them.

*The Unions Do Not Plausibly Allege Market Power*.  The unions say every hospital in the city has the right to seek placement on insurers' participating provider rosters.  But not NYP.  It has "market power," they say.  Yet they fail to allege shares giving rise to a plausible inference of power.  So instead, they say NYP is, in their *opinion*, a "must have" hospital that charges too much and signed the contracts they challenge.  If that sufficed, *any firm* that signs a contract with terms or prices someone disliked would have market power.  In *American Express*, the Supreme Court rejected that argument, concluding that such facts are not "direct evidence" of market power in unilateral anti-steering cases.  This Court should too.

*NYP's Network Participation Agreements Are Not Exclusionary*.  When NYP enters into a network participation agreement, it is offering its services to the insurer's members for a discount off billed charges.  The agreement does not prevent insurers from contracting with other hospitals for similar network inclusion, and it confers no special privileges or favored treatment on NYP.

The agreements are also inclusionary because including NYP yields a broader, more open network that neither discriminates against NYP nor penalizes patients by denying benefits.

The unions object that network admission was coerced by "all or nothing" discounts, rather than à la carte discounts for each insurer plan and NYP service or site. But they now concede that they fail to satisfy any of the well-settled "tests for tying, bundling, and exclusive dealing that distinguish lawful volume discounts from other forms of predatory or anticompetitive behavior." Their argument that the Court should nevertheless condemn NYP's participation agreements without applying *any test* to separate "anticompetitive conduct" from competition on the merits is inconsistent with the case law and contrary to our system of free enterprise.

*NYP Has Not Foreclosed Any Competing Hospital*. The unions' core grievance is that they wished insurers had created plans excluding NYP so their members would be *forced* to use cheaper alternatives. That is not an antitrust complaint. The Sherman Act protects the competitive process, so any claim requires *competitive foreclosure*. Without it, there can be no anticompetitive effect. The unions concede they cannot show foreclosure, and their argument that they need not do so is wrong. The Complaint should be dismissed.

## II. THE UNIONS ARE TOO REMOTE TO CHALLENGE NYP'S NETWORK PARTICIPATION AGREEMENTS.

This case presents a fundamental question: *Who* gets to control the design of *insurers'* provider networks? Is it the insurer who creates the network, negotiates the rates, and sells the resulting plans to unions, employers, and patients? Or does the Sherman Act give every employer and union in the country a veto over those negotiations? The answer is clear: insurers, not unions, are the efficient enforcer of whatever limits the Sherman Act places on insurers' negotiations.

To "determine whether a party can sue under the antitrust laws," courts "apply the efficient enforcer test," which is an "elaboration on [*Associated General Contractor's*] proximate cause

3

requirement." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 134 (2d Cir. 2021); *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 65 (2d Cir. 2019). That test is "demarcated by the 'first step' rule, which limits liability at the first step of the causal chain of the defendants' actions." *Id*.

Here, the unions do not dispute that they are *two* steps removed from the defendant. They have no contractual relationship with NYP, and whatever harm they suffer runs entirely through their contracts with insurers. Indeed, but-for these intervening contracts, the unions would have no alleged injury whatsoever.[2]

### A.     The Unions Do Not Defend Their Injunctive Relief Claims.

The unions concede that they have no right to interfere with the insurer-provider contractual negotiations. Neither union defends its injunctive relief claim or addresses the limits the "efficient enforcer" test places on their ability to seek such relief.[3] That silence is both a waiver and an admission that only insurers can seek ongoing relief relating to their contracting freedom.

The unions have no seat at the table because the challenged restraints do not constrain their freedom of contract. In response, the unions turn to semantics. They are "constrained," they say, because they cannot buy plans with a different configuration of providers. CW Br. 15. That is not a restraint on the unions' *freedom*. It is a downstream effect of insurers' network design decisions. Tesla buyers don't have a claim just because their cars come with Goodyear, not Michelin, tires.

---

[2] The unions do not dispute that *AGC* standing governs their state and federal claims, and that the Donnelly Act's *Illinois Brick* repealer has no bearing. Nor can the unions' Donnelly Act claim survive if their federal claim is dismissed, since supplemental jurisdiction would be absent.

[3] *See* CW Br. 18 (arguing only that plaintiffs have "antitrust standing to sue to recover the NYP overcharges they paid;" and addressing injunctive relief only in connection with *Illinois Brick*); UFCW Br. 9 (same, addressing remoteness only under Clayton Act, § 4, not § 16).

Indeed, the unions' interests conflict with those of insurers and patients, their contractual counterparties. The unions may want restricted choice networks that discriminate against NYP – "yes, to exclude or discriminate," as Cement Workers proudly proclaims. *See* CW Br. 3. But when insurers list NYP on their rosters – after "balanc[ing] the need to build networks" that "patients may need or want" against "the need to build networks that offer reasonable prices," *see* Cmplt. ¶¶ 49, 54 – they have decided that open-access networks are better than the restricted ones the unions want. That is a conflict of interest.

The unions offer no retort. They acknowledge that "the existence of [another] identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement" defeats standing. CW Br. 14 (quoting *AGC*). And they concede that the challenged contractual restraints govern insurers' behavior, not theirs. This makes the insurer *the* efficient enforcer. While their Complaint asserted that insurers were too weak or naïve to know that the provisions they *agreed* to "are not in [their] interests," *see* Cmplt. ¶ 155, their opposition wisely abandons that argument, leaving them with no defense for their injunctive relief claims.

### B.     The Unions Are Too Remote to Sue for Damages.

The unions try to salvage their claims by saying that they at least have standing to pursue damages. They do not. The "difference in remedies does not affect the proximate cause analysis." *See In re Am. Express*, 19 F.4th at 143 n.10. If the unions are too remote to enjoin the challenged practice, they cannot sue for damages from its continuation. The law does not give them an annuity in perpetuity for "damages" from provisions they cannot ask a court to block. In any event, their damages claims also fail *AGC*.[4]

---

[4] UFCW incorrectly asserts that NYP "challenges only the first factor of the efficient enforcer test." UFCW Br. 10. Not so. The unions lack standing because (i) their injuries are derivative of the insurers; (ii) insurers are more than capable of vindicating the public's interests in antitrust

The efficient enforcer test also governs damages. The unions recognize that, *if* the insurers can sue for damages, the insurers are the efficient enforcers, not them. So, the unions ask this Court to strip the insurers of their putative damages claims. If the Court did this, they say, the unions would be "the only plaintiffs who can sue," because "no other entity [would have] a claim for the overcharges." CW Br. 15; UFCW Br. 8. The Court obviously cannot do that.

Retreating, the unions ask the Court to split the insurers' claims in two. They see a fine distinction between insurers' fully-funded and self-funded plans. For the former, they concede insurers are *the* efficient enforcers and that subscribing employers and unions lack standing. But self-funded plans, they say, are different, because the subscribing unions "bear the [ultimate] financial risk and responsibility for their members' healthcare." UFCW Br. 7. But any difference between these two plans – both products offered by insurers – has no antitrust significance.

Insurers create the *same* networks for both fully-funded and self-funded health plans; those networks are governed by the *same* contract between insurer and provider; and the rates the insurer negotiates do not distinguish between the two types of plans. Cmplt. ¶¶ 46, 50. The unions' proposed split would create an untenable patchwork: insurers could sue for injunctive relief for all plans and damages for some, but not others. There is no basis for that split. Regardless of how the insurers allocate the financial risk, the injury *always* flows through the same, solitary contract between the insurer and NYP.

Nor does antitrust standing turn on the allocation of insurance risk. The unions concede that the only difference between fully-funded and self-funded plans is how the risk is diversified.

---

enforcement; (iii) the unions' injury – that they would pay less if insurers created different health plans for their benefit – is speculative; and (iv) it is difficult to apportion damages because insurers decide plan-by-plan how much of the purchase price is paid by them, by patients, and by unions.

Fully-funded plans spread risk across the covered lives in the insurer's fully-funded books of business; self-funded plans spread it across the employer's payroll. But the decision of where to place the insurance risk is made *by the insurer* in the insurance market. It has nothing to do with NYP or the challenged conduct. Nor does the insurers' choice affect the alleged anticompetitive effect: if the challenged conduct raises rates, it does so for both types of plans. Any injury flowing from that single, undivided rate negotiation between NYP and the insurer, does not bypass the insurer merely because it *later* pushes its risk downstream onto an employer or union.

The unions don't dispute this, but say, a plaintiff can have standing "even where [their] injuries are downstream of the anticompetitive conduct." CW Br. 14. But their problem is two-fold. *First*, calling themselves "direct purchasers" does not make them so. That label is a legal conclusion, not a factual allegation. And it is wrong.

The unions do not "purchase" anything. They enter a web of contracts, including collective bargaining agreements with employers, membership agreements with employees, and benefit-plan arrangements with insurers. These interlinking contracts may obligate the unions' welfare funds to cover *some* of their members' healthcare costs, but they do not make them "purchasers." NYP delivers its services directly to patients pursuant to contracts NYP entered into with each patient and their insurer. Were those services physical products, "title" would run to the patient, or perhaps the insurer—but not to the unions. The unions cannot enforce NYP's contractual obligations to patients or insurers, or demand that NYP treat their members. Nor are their obligations to cover members' medical bills found in any NYP contract. The unions are therefore not purchasers at all, but if they are, they are indirect.[5]

---

[5] The unions rely on the factual background section in *U.S. v. Anthem, Inc.*, 236 F. Supp. 3d 171, 187 (D.D.C. 2017), observing that "the employer pays the health care costs directly" in self-funded plans. That dicta does not carry the weight the unions ascribe to it. *Anthem* was a DOJ merger

*Second*, the unions' argument – that standing exists even where injuries are "downstream" of the conduct – misses the point. The problem is not just that the challenged *conduct* occurs at the insurer-provider interface; it's that the *injury* flows through that same contract and reaches the unions only through a separate, intervening contract between insurer and union.

The unions' cases are inapposite for this reason. They are competitor-foreclosure cases, in which the defendant first drives rivals from the market and then executes contracts at inflated prices in the absence of competition.[6] It is a two-stage process, with two discrete overt acts *by the defendant* occurring in serial succession—both necessary, both intertwined. Flowing from each act is a different injured party, each one step away from an overt act in the causal chain. The competitor is one step away from the exclusionary conduct; the purchaser who negotiates the inflated prices is one step away from the sales contract. In these cases, there is no *intervening* market participant or third-party contract standing between the defendant and the purchaser.

This case is different. There is no two-stage foreclosure, or any foreclosure. There is only a single contract, containing both the challenged provisions and the rates. The insurer is therefore *both* the one allegedly restrained and the party to the sales contract that contains the allegedly inflated prices. The insurer is one step away from all NYP's alleged overt acts. The unions, whose injuries flow through their *separate* contracts with insurers, are *two* steps removed in that chain.

---

challenge, where standing and remoteness are not an issue and are not elements of the claim. More importantly, the court *rejected* the argument that self-funded plans operate as mere pass-through vehicles between provider and insurer, finding instead that profits from the challenged conduct would "end up in the coffers" of the insurer. *Id*. If the insurer was nothing but an administrative conduit – rather than a competitive decision-maker standing between providers and employers – Anthem would have won its case, and there would be one less insurer in the country.

[6] *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 683 (2d Cir. 2009) (defendants conspired to delay generic entry and then entered into sales contracts *with the plaintiffs)*; *U.S. v. Live Nation Ent., Inc.*, 2025 WL 835961, *4 (S.D.N.Y. 2025) (defendant first eliminated rivals and then sold tickets to plaintiffs at elevated prices).

The following diagram illustrates the point and resolves this case.

## III.  ILLINOIS BRICK BARS THE UNIONS' DAMAGES CLAIMS.

The unions' damages claims are also barred by *Illinois Brick*.  A half century of black letter law establishes a "bright-line rule that authorizes suits by direct purchasers but bars suits by indirect purchasers."  *Apple Inc. v. Pepper*, 587 U.S. 273, 279 (2019).  All parties agree that *either* the insurer or the unions can sue for damages, but not both.  So this Court must strip one or the other of their claims.  The unions say the Court should save them; the law says otherwise.[7]

---

[7] Cement Workers cites *In re Xyrem Antitrust Litig.*, 2024 WL 4023561 (N.D. Cal. 2024), because it barred insurers from recovering for drug purchases reimbursed by employers.  But drugs are different than hospital services.  There is no privity of contract between the drug manufacturer and the insurer or employer.  Rather, drugs are sold to pharmacies.  So federal claims for *both* insurers and unions are barred by *Illinois Brick*.  Indeed, even the Amended Complaint there recognized that employers, who ultimately "provided reimbursement," likely "cannot assert damages claims under federal law."  *See* Amended Complaint, 3:20-md-02966, ECF 62 (N.D. Cal).  So too here, the unions' federal damages claims are barred under federal law.

*Pepper and the Privity Principle*.  The unions concede that they lack contractual privity with NYP.  That singular fact is "dispositive."  *Pepper*, 587 U.S. at 281.  In *Pepper*, the Supreme Court re-affirmed that *Illinois Brick*'s bright-line rule follows basic contracting principles.  As the dissent noted, the majority's rule "replaces a rule of proximate cause and economic reality with [a] formulistic rule of **contractual privity**."  *Id.* at 289 (Gorsuch, J., dissenting).  The majority also recognized its rule "was not based on any economic theory about who sets the price," but was designed to provide a "straightforward" rule "grounded on the belief that simplified administration improves antitrust enforcement."  *Id*. at 281-82.  Under this rule, the presence of any "intermediary" in the chain of distribution defeats the claims of those below it.  *Id*.

*Pepper* governs this case.  The unions do not dispute that insurers are intermediaries, who set the price and are the only parties (beyond patients) in the chain of distribution to directly contract with NYP.  But they say, "a requirement of contractual privity … would flatly contradict … *Blue Shield of Virginia v. McCready*."  UFCW Br. 14; CW Br. 12 (similar; *citing McCready*).  In their view, they can sue as long as their "injury is clearly foreseeable."  *Id*.  But *McCready* addresses the *separate* doctrine of antitrust standing.  It did not address *Illinois Brick*, or its bright line rule.  Put simply, the unions latch on to the wrong line of cases.[8]

Moreover, the plaintiff in *McCready* was a *direct purchaser* from the *defendant* insurer, which had conspired with others to eliminate insurance coverage for psychology services.  Because

---

[8] The unions also cite *Live Nation*, 2025 WL 835961, and *Uriel Pharm. Health & Welfare Plan v. Advoc. Aurora Health, Inc.*, 2023 WL 12284689, *2 (E.D. Wis. 2023), though neither mentions *Illinois Brick*.  The unions also misplace reliance on *Loeb Industries, Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002), which merely noted that *Illinois Brick* does not "eliminate in one fell swoop all competitor suits based on exclusionary practices."  That does not apply here because the unions are not competitors but *are* in NYP's *chain of distribution* – they just lack privity *within* that chain.  *Loeb*, in contrast, involved plaintiffs suing on products the *defendants* never sold to anyone.  Remoteness, not *Illinois Brick*, governs that situation.

she had privity with no intervening third party in sight, she satisfied *Illinois Brick*, which may explain why the Court did not address the doctrine.

*The Unions' Credit Card Construct is No Cure*.  Conceding that *Pepper* established a "no intermediaries rule," the unions nonetheless say some intermediaries count and others do not.  Insurers are mere administrative conduits, they say, so the Court should look through them.  The unions say they are like consumers who "used credit cards" to buy price-fixed products from retailers.  They note that, when tracking the flow of funds, the credit-card issuer is technically the last person to touch the *money* before it is deposited in the retailer's account, and yet that does not make the credit-card issuer a direct purchaser.  CW Br. 10.

The unions' analogy defeats them.  A consumer buying a product from a retailer is in direct privity with it, enters the very purchase contract containing the overcharge, and takes title directly from it.  The claim accrues at the point of *contracting*—not when the credit card company, acting as the consumer's *agent*, transfers the cash.  This case is nothing like that.  There is no privity; the unions do not enter into contracts with providers; and they receive neither services nor title to anything.  Nor are the insurers mere agents of the unions.  Unlike a principal, the unions have no right to enforce any rights or obligations under the insurer-provider contract.  Instead, they are mere counterparties to a web of arrangements obligating them to transfer cash *to the insurer* to cover some portion of members' costs of treatment under insurers' provider contracts.  That does not make the unions direct purchasers.

In *In re NorthShore University HealthSystem Antitrust Litig.*, 2018 WL 2383098, *8 (N.D. Ill. 2018), the court reached the same conclusion.  The insurer, not the employer, was the "entity [that] negotiated and maintained the contract with the healthcare provider," and so, the employer could not sue under *Illinois Brick*.  The UFCW concedes that *NorthShore* kills the unions' claim,

but it says the Court should disregard it because it is "out-of-circuit." UFCW Br. 14. It claims *NorthShore* is inconsistent with *Pepper* and four other cases, none of which discuss *Illinois Brick* and one of which is not an antitrust case. That is no reason to disregard good law.[9]

*The Unions' Cost Plus Exception Waiver.* Nor can the unions side-step *Illinois Brick* by claiming to be "financially liable for paying benefits." CW Br. 8. People may be "liable" for many things, without being direct purchasers. Car insurers, for example, may be responsible for repairs, but do not own the car or buy the parts. In contrast, homeowners may buy houses using a sales agent to broker the deal. *Illinois Brick* addresses this difference through the "fixed-quantity, cost-plus" exception.[10] It provides a safety valve for conduit cases. But as NYP explained in its opening letter brief, the unions do not qualify. In response, UFCW does not address the exception; and Cement Workers *expressly* declines to take advantage of it. CW Br. 12-13. They have, therefore, waived it.

---

[9] Cement Workers' attempt to distinguish *NorthShore* falls factually flat. They say "NYP has the *contractual* right to seek payment" from the unions. CW Br. 11. The Complaint does not allege that. It posits a hypothetical where, *if* a union fails to pay *the insurer*, NYP may seek payment from the union, presumably under the *equitable* doctrines of *quantum meruit* or unjust enrichment. Cmplt. ¶ 52. That does not negate *Illinois Brick*. Cement Workers also misplaces reliance on *Elec. Med. Tr. v. U.S. Anesthesia Partners, Inc.*, 2024 WL 5274650, *6 (S.D. Tex. 2024), which declined to dismiss a union's claim because the "chain of distribution [was] not alleged in the Complaint." Here, the unions alleged the chain of distribution in detail, establishing that the unions lack privity.

[10] In *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 217 (1990), the Supreme Court questioned the wisdom of this exception, noting that it is an "unwarranted and counterproductive exercise to litigate a series of [direct purchaser] exceptions." Multiple circuits have since cast doubt on its continued existence, and the Second Circuit said it would be narrowly construed if recognized. *See McCarthy v. Recordex Serv. Inc.*, 80 F.3d 842, 855 (3d Cir. 1996); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 533 F.3d 1, 3-4 (1st Cir. 2008); *Simon v. KeySpan Corp.*, 694 F.3d 196, 202-04 (2d Cir. 2012).

## IV. THE UNIONS FAIL TO ALLEGE MARKET POWER.

The unions' claims fail because NYP does not possess market power. In their oppositions, the unions abandon the position they staked out in their Complaint that "judgment may be entered … without precisely defining the particular markets that NYP has harmed or demonstrating NYP's market power in those markets." Cmplt. ¶ 130. They concede that market power is an element of their claims. That does not help them, because the Complaint does not plausibly allege it.

They first argue that they alleged direct evidence of market power. NYP, they say, charges "supracompetitive prices" and entered into "anticompetitive restraints." *See* CW Br. at 19. But that is not evidence of market power. If it were, nearly every seller who imposes a disliked term and charges a price the buyer thinks is too high would have "market power." That is not the law. The "market power" requirement does real work to filter vertical agreements that raise concerns from those that don't. It cannot be so easily evaded.

The Supreme Court's decision in *American Express* controls. There, citing Judge Easterbrook, the Court noted that "the possibility of anticompetitive manifestations of vertical arrangements can only occur if there is market power." *Ohio v. American Express Co.*, 585 U.S. 529, 543 n.7, 548 (2018) (citing Easterbrook, *Vertical Arrangements and the Rule of Reason*, 53 Antitrust L.J. 135, 160 (1984)). The Court "disagree[d]" that evidence Amex "increased merchant fees" and included the challenged provisions in its contracts showed anticompetitive effects. *Id.* That is the same "evidence" the unions cite here. If it was not sufficient to *dispense* with the need to prove market power or establish anticompetitive effects in *Amex*, it cannot be *proof* of market power here. Any other ruling would be an end-run around *Amex*.

*Claiming NYP Charges More than Others Is Not an Allegation of Market Power*. The unions argue that NYP has "market power" because NYP is supposedly "the most expensive

hospital system in New York."  UFCW Br. 6.  But there is always a most-expensive seller of any item.  That does not mean each one has market power.  It merely shows that a seller gets to decide what price to charge, a right every seller has.

That is why a plaintiff must first define the relevant market, and then show the defendant *caused* higher prices *throughout* that market.  For example, if a monopolist restricted output and prevented others from expanding, evidence of supply shortages and price hikes throughout the market might be "direct evidence" of market power.

But the fact that a seller sets its own price – at whatever price the market will bear – is not the same.  As the Supreme Court noted, in a "vertical" case – where the "agreement [only] affects one particular method of competition" – it is not enough to present evidence covering only "part of the market."  *Amex*, 585 U.S. at 551 n.10; *see also N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 2026 WL 1397077, *2 (2d Cir. 2026) ("direct evidence" must be "evaluated in a market context.").  Indeed, even market-wide pricing evidence is insufficient because "market power is the ability to raise price profitably by *restricting output,*" not just setting price.  *Id*. at 549.  So output must also be measured market-wide.  *See id*. (rejecting claim because "the output of credit-card transactions grew").

It is no easy task to couple market-wide pricing data with market-wide output data and then attribute the changes to the defendant's actions.  That is why most plaintiffs do not try, opting to rely on market shares instead.  But if the unions want to proceed down this path, they have to allege it.  They did not.

*The Unions' Allegation that NYP's Contracts Contain the Challenged Provision Is Not an Allegation of Market Power.*  The unions argue that NYP has market power because it imposes "unwanted" restrictions in its network participation agreements.  CW Br. 23.  But every *obligation*

or *restriction* in a contract is "unwanted" by the obligor. They accept it, not because the seller possesses market power, but because the seller offered consideration.

Here, the unions allege that providers, like NYP, offer "substantial reductions" from their billed charges to obtain in-network status. Cmplt. ¶ 58. That cannot be enough to prove market power. Every hospital on an insurer's roster – by virtue of being listed – *simultaneously* "restricts" insurers from designing "selective" networks that exclude them. But that cannot be "direct evidence" that each hospital in the country has market power.

*The Unions' Allegation of Barriers to Entry Is Not an Allegation of Market Power*. The unions argue that market power can be presumed from evidence of "high barriers to entry." But such evidence is not evidence of market control. It is not even defendant-specific evidence. At most, it is a pre-requisite to pleading *indirect* evidence of market power through market share. Without entry barriers, even large market shares will not evince power to impose anticompetitive effects because entry would dissipate them. *See U.S. v. Syufy Enters.,* 903 F.2d 659, 664 (9th Cir. 1990) ("Time after time, we have recognized [that] a high market share, though it may raise an inference of monopoly power, will not do so in a market with low entry barriers").

*The Unions' Market Share Allegations Are Deficient*. The unions do not allege market shares that give rise to a plausible inference of market power. In their oppositions, the unions accuse NYP of "misstat[ing] the law by arguing that only a defendant with more than 50% can possess market power." UFCW Br. 3, 16. But NYP did not argue this. The Complaint alleges that NYP has "*less* than 50% market share" or "*under* 50% market share." Cmplt. ¶¶ 148, 185. But alleging what a share is *not* is not the same as alleging what it *is*. In their primary alleged market, New York City, the unions allege no market share at all. That is fatal to their claim.

For their alleged submarkets, the Complaint merely references the DOJ's allegations of shares between 25 and 30%. But as NYP's opening brief explained, that too is insufficient. In response, the unions cite two credit card cases, finding that Visa and MasterCard "jointly and individually" possess "market power even though [MasterCard's] share was just 26%." *In re Payment Card Interchange Fee Antitrust Litig.*, 714 F. Supp. 3d 65, 98 (E.D.N.Y. 2024); *U.S. v. Visa U.S.A., Inc.*, 344 F.3d 229, 235 (2d Cir. 2003). But those courts noted that MasterCard and Visa were owned by the same overlapping member banks and collectively held over 75% of the market. As to MasterCard alone, the district court rejected the argument that its share sufficed, resting its holding instead on direct evidence of market power. Those cases do not stand for the proposition that shares of 30% or less suffice.

## V. THE UNIONS FAIL TO ALLEGE EXCLUSIONARY CONDUCT.

When you go to the hospital, the first thing you think is, "is everyone going to be ok?" The second thing you think is, "is my insurance going to cover it?" This case is about whether NYP can have its services covered when patients seek treatment. The unions say "no." In the but-for world, patients would show up to NYP's doors and be turned away for lack of coverage. That turns antitrust on its head. Negotiations for network inclusion are inclusionary, not exclusionary.[11]

---

[11] In trying to distinguish *Med. Ctr. at Elizabeth Place, LLC v. Premier Health Partners*, 2017 WL 3433131 (S.D. Ohio 2017), Cement Workers misreads the case. The court engaged in extensive discussion of why the anti-steering provisions are not *per se* illegal, which was the only question after the plaintiff "disavowed" its rule of reason claim. *Id*. at 1. In doing so, the court cast doubt on *every* theory of anticompetitive harm associated with the practice. At the end of a series of "*arguendo*" statements, the court noted that, even if a jury "*could* ultimately conclude that the [challenged provisions] are an unreasonable restraint of trade," it would still be subject to a full rule of reason analysis. The court did not say – as Cement Workers claims – that the "evidence *did* make out a rule-of-reason claim." CW Br. 27 n.6 (emphasis in original).

The unions concede that this case is not about exclusivity, refusals to deal, or "exclusive dealing," which "plaintiffs do not assert." UFCW Br. 27. That is critical. What is absent is what the antitrust laws police: exclusionary conduct. What is left is a discount: competition on the merits. NYP's participation agreements do not prevent insurers from contracting with competing hospitals. Whether insurers include one or a hundred other hospitals is entirely up to them. Indeed, the unions perversely claim that the problem is that insurers' networks are not *exclusionary* enough. They want insurers to drop NYP and "yes, to exclude or 'discriminate' against [it]." CW Br. 3. That is not an antitrust problem for the courts to solve.

### A. NYP Is Allowed to Seek Inclusion in Insurers' Networks.

This case is about discounting. Insurers offer coveted spots on their participating-providers rosters to hospitals that give insurers "substantial reductions" on billed charges. Cmplt. ¶ 58. This puts "powerful downward pressure on the price a healthcare provider," like NYP, "is willing to charge" because patients usually "choose to see 'in-network' providers." Cmplt. ¶ 5. That is price discounting.[12] As American as apple pie. It is called the Managed Care Bargain. And "competition for increased market share is not activity forbidden by the antitrust laws." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 116 (1986).

When a deal is reached, it is memorialized in a network participation agreement. That is the genesis of the All Products Clause. It obligates NYP to provide all its services to covered

---

[12] UFCW says this case is not about discounts because the Complaint does not use that word; it uses the term "negotiated rates." UFCW Br. 26. Artful phraseology cannot detract from the Complaint's own allegation that insurers contract with providers precisely to obtain a "substantial reduction on price" from their billed charges. Cmplt. ¶ 58. Nor is there merit to UFCW's argument that NYP doesn't offer "volume discounts" because its rates are supposedly higher than others. In antitrust law, the term "volume discount" refers to the price the *defendant* would have charged absent the additional volume. UFCW does not dispute that NYP offered such discounts.

patients at discounted rates, and the insurer must likewise include NYP on its roster. That simple act of listing NYP as a participating provider expands the insurers' network, creating open-access networks that do not discriminate against anyone. It gives NYP no more favorable treatment than any other hospital. The *only* prohibition is that the insurer cannot renege on the deal for the life of the contract. Having agreed to include NYP, it cannot say "sorry, I didn't mean it."

The unions do not dispute this. But even though insurers *agreed* to these terms, the unions say they shouldn't have. The All Products Provision is "not in the insurance companies' interest," they proclaim, because insurers may value NYP more for some plans, services, or facilities than others. Cmplt. ¶ 155. If unions had their druthers, there would be plans based on a more "selective" list of providers. But how is that network supposed to come about? Is NYP required *by the Sherman Act* to refuse participation in at least some insurer plan? Is it barred from offering discounts for participating in them? Or are insurers prohibited by law from including NYP if that is what they want? One of these must be true for the unions' theory to work. None is the law.

### B. The Unions Failed to Allege the Elements of the Anticompetitive Conduct Tests Governing NYP's Volume Discounts.

Recognizing NYP has a right to be on all plans if that is what the insurers want, the unions retreat: don't look at the All Products Clause as executed, look at the antecedent negotiations. NYP, they say, offers discounts on an "all or nothing" basis; it should be required to negotiate à la carte. But a single rate sheet, with lower prices for more volume, is not illegal. When you go to the store, the big carton costs $1 per unit; the small one $2. That discount is offered "all or nothing." You can still buy as much or as little as you want – that is, there is no refusal to deal even if the deal is not taken – but the *discount* only attaches to the bigger box. Were it otherwise, there would be no consideration for the discount. Here, participating in two plans is like buying the bigger carton. Including two services or sites in the plan is like a happy meal.

The law does not impose à la carte discount negotiation obligations. It has established tests for determining when volume discounts or multi-product bargaining crosses the line from competition on the merits into anticompetitive conduct. The unions eschew them. They concede they cannot satisfy any of the "tests for tying, bundling, and exclusive dealing that distinguish lawful volume discounts from other forms of predatory or anticompetitive behavior." *See* CW Br. 27; NYP Br. 3. Nor do they offer any test of their own.

Instead, the unions say no test is required because "anticompetitive conduct comes in many different forms and cannot always be categorized."[13] CW Br. 27. But procompetitive conduct comes in an even greater variety. That is why courts have established tests to distinguish between the two. Different conduct, different tests. But some test is always required. The need for specific tests is especially acute in discounting cases. As "the Supreme Court consistently reminds us…, mistaken inferences in a case driven by price-cutting activities can be especially costly, because they chill the very conduct the antitrust laws are designed to protect." *In re EpiPen Antitrust Litig.*, 44 F.4th 959, 987-1004 (10th Cir. 2022) (rejecting claim where the plaintiff "does not explicitly mention any of [the applicable] legal standards in its brief," and noting that volume discounts for "formulary placement" is "legitimate price cutting" activity, not anticompetitive conduct).

The Supreme Court's decision in *LinkLine* illustrates the proper approach. There, the Court held that the "plaintiffs' price-squeeze claim" was "nothing more than an amalgamation of a meritless claim at the retail level and a meritless claim at the wholesale level," which failed the

---

[13] Cement Workers misplaces reliance on *FTC v. Deere & Co.*, 2025 WL 1638474 (N.D. Il. 2025), and *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337 (4th Cir. 2024). Both were § 2 cases, which employs a more *general* test for exclusionary conduct given the elevated "monopoly power" requirement. *Deere* was also not a pricing case; it involved technological tying. And while *Duke* was, in part, a pricing case, the court *did* apply the price-cost test—it simply found a fact issue about whether prices were below cost, something not *alleged* here.

tests for both refusals to deal and predatory pricing. *Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438, 452 (2009). Just as the *LinkLine* plaintiff could not escape the relevant tests by relabeling its claim a "price squeeze," the unions cannot avoid them by separating the All Products Clause from the discounts offered in exchange for it. The unions' position – that courts should eschew the tests they spent decades developing whenever a plaintiff fails to satisfy them – proves too much. It would mean there is no test for anything.

The unions fare no better when they focus on the two evils they say flow from the All Products Clause. *First*, they say that because insurers value NYP more for some plans than others, NYP should offer different discounts for each. But this is no different from offering a discount on the big carton and charging list price for the small one. Volume discounts like this reflect the law of diminishing demand. Courts don't condemn them absent evidence that (i) the discount prevents an "equally efficient rival" from competing for *any part* of the demand; (ii) it is predatory under the applicable price-cost test; and (iii) it allows the defendant to later recoup the discount through supra-competitive prices. *See In re EpiPen*, 44 F.4th at 1003; *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 406 (3d Cir. 2016). The unions allege none of this.

*Second*, the unions claim, that although insurers "generally engage in a single negotiation for clusters of services that will be available to [users] of the network," NYP – *and NYP alone* – should be forced to conduct separate negotiations for each service and site. *See* Cmplt. ¶ 55; UFCW Br. at 21. This is their "No Happy Meal" theory. But it is just an allegation of a multi-product bundle. Courts do not condemn such discounts unless they violate the discount attribution test, which requires a form of below-cost pricing. *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 906 (9th Cir. 2008); *Ortho Diagnostic Sys., Inc. v. Abbott Lab'ys, Inc.*, 920 F. Supp. 455, 469 (S.D.N.Y. 1996) (a plaintiff "must allege" that the bundle "makes it unprofitable" for an

equally "efficient" producer "to continue to produce"); *Info. Res., Inc. v. Dun & Bradstreet Corp.*, 359 F. Supp. 2d 307, 307 (S.D.N.Y. 2004) ("The law in this circuit bars claims of … anti-competitive pricing" in bundling cases only if prices are below cost after properly allocating the discounts across the products).  The unions allege none of this either.

Instead, they say they "plausibly" alleged "anticompetitive conduct" simply because the DOJ filed suit challenging NYP's anti-steering provisions.  That is not enough.  The DOJ sued Amex too, and the Supreme Court rebuked it, explaining that "there is nothing inherently anticompetitive about Amex's anti-steering provisions."  *Amex*, 585 U.S. at 551.  So the DOJ's suit places no halo around this one.  In any event, the unions filed their Consolidated Complaint after the DOJ sued.  They were free to – and did – copy whatever they wanted.  If the unions' Complaint is still deficient, it can't be saved just because the DOJ is also a civil litigant who must also prove its case like any other.[14]

Finally, in their zeal to dispense with the need to allege "anticompetitive conduct," the unions say "effects" are enough.  They rely on two out-of-circuit cases – *Atrium* and *Uriel* – for this misguided view.[15]  But *Atrium* predated *Amex*, and *Uriel* merely followed *Atrium*.  In response, UFCW tries to downplay *Amex*, contending that it held only that anti-steering provisions are not "inherently anticompetitive," not that they "never" are.  UFCW Br. 26.  But the Court thoroughly analyzed them before finding that they reflect the normal operation of the market and "do not

---

[14] The unions ascribe significance to the fact that NYP *thoroughly* answered the DOJ complaint. That reflects *procedural* differences between these cases.  But since the unions ask the Court to take judicial notice of the Answer, the Court should feel free to review it—it is illuminating.

[15] *U.S. v. Charlotte-Mecklenburg Hosp. Auth. ("Atrium")*, 248 F. Supp. 3d 720 (W.D.N.C. 2017); *Uriel Pharm. Health & Welfare Plan v. Advocate Aurora Health, Inc.*, 2023 WL 12284689 (E.D. Wis. 2023).

prevent [competitors] from competing … by offering lower [prices] or promoting their [products]." *Amex*, 585 U.S. at 551. That was not dicta. It was essential to the holding.

But even putting *Amex* aside, *Atrium* and *Uriel* cannot withstand scrutiny. They required allegations of "market power" and "anticompetitive effects," but overlooked the key – *statutory* – requirement that there be a "restraint of trade," that is, that conduct be exclusionary. *See* 15 U.S.C. § 1. That was error. As Judge Easterbrook explained, "there can be no restraint of trade without a restraint." *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 397 (7th Cir. 1989) (Easterbrook, J.); *Sanderson v. Culligan Int'l Co.,* 415 F.3d 620, 623 (7th Cir. 2005) (same).

That same "truism decides this case." *Schachar*, 870 F.2d at 397. Without the "anticompetitive conduct" or "restraint" element, every contract a large firm enters with a price some buyer thinks too high (that is, every contract) would face judicial review and approval— regardless of whether it prevented *competitors* from competing. That would transform the Sherman Act from a statute designed to protect the "competitive process" to one that regulates prices and output. That is not our system of free enterprise. *See Linkline,* 555 U.S. at 452-53 ("We have repeatedly emphasized the importance of clear rules in antitrust law," as "antitrust courts normally avoid direct price administration."); *In re EpiPen*, 44 F.4th at 1000 (plaintiffs must "prove harm to the competitive process"); *U.S. v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (same); *PeaceHealth*, 515 F.3d at 903 (non-predatory bundling is just a "price discount" that "will not cause long-run injury to the competitive process").

## VI.     THE UNIONS FAILED TO ALLEGE COMPETITOR FORECLOSURE.

The unions' claims also fail because they do not allege that NYP's participation agreements foreclosed any competitor from the market. They don't allege the agreements drove rivals out of

the market, blocked their entry, or raised their costs.  They allege no adverse impact *on competitors* whatsoever.  This is fatal.

    *Anticompetitive Effects Requires Supply Foreclosure*.  The unions agree that they must allege anticompetitive effects.  But an anticompetitive effect requires an adverse impact on output in the relevant market.  This is a fundamental requirement grounded in economics 101, illustrated on the right.  When supply is restrained, prices go up.  When prices go down, more is bought and there must be more supply to fill the demand.  That is why, as the Supreme Court emphasized, anticompetitive conduct requires the "ability to raise



price[s] profitably *by restricting output*."  *Amex*, 585 U.S. at 549 (emphasis in original).  Pricing alone proves nothing, the Court explained, because where "output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand."  *Id*. For that reason, plaintiff must allege a reduction in output causally related to the challenged practice.

    Competitive "foreclosure" of rivals' supply is how courts assess whether conduct in a vertical restraint case is *capable* of restricting output.  There are only two ways to restrict market output: a firm can curtail its own sales and block rivals from filling the void, or it can expand its own sales while forcing rivals to produce even less, yielding a *net* reduction.  Either way, output falls only if rivals are foreclosed.  Where conduct *increases* the defendant's sales – as it does here by granting NYP in-network status across more plans – the first path is off the table.  So, the unions must allege that the conduct caused other hospitals to exit the market, prevented their entry, or raised their *costs* of expanding.  That is, they must allege supply foreclosure.

As Judge Posner explained, a plaintiff "must prove that [exclusionary conduct] is likely to keep at least one significant competitor of the defendant from doing business in a relevant market. If there is no exclusion of a significant competitor, the agreement **cannot possibly harm competition**." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984) (Posner, J.) (exclusive dealing). Judge Easterbrook echoed this point: "unless one group of suppliers diminishes another's *ability* to peddle its wares (technically, reduces rivals' elasticity of supply), **there is not even the beginning of an antitrust case**." *Schachar*, 870 F.2d at 399 (standards manipulation). Put simply, the conduct "must be capable [of] driving [rivals] from the market, or ... causing *them* to raise their prices to supracompetitive levels within a disciplined oligopoly," which itself restricts supply. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) (discounting).

Bundling cases similarly require allegations that the "defendant's pricing makes it unprofitable for the plaintiff to continue to produce." *Ortho*, 920 F. Supp. at 469; *Ramallo Bros. Printing, Inc. v. El Dia, Inc.*, 392 F. Supp. 2d 118, 132 (D.P.R. 2005) (bundling claim "inherently implausible" where there was no evidence that competitors would be "eliminated from the ... market."). The same is also true in anti-steering cases, as the Supreme Court has recognized.

*The Unions Confuse Anticompetitive Conduct and Anticompetitive Effects*. Against this authority, the unions argue that supply foreclosure is "not a requirement outside the context of exclusive dealing claims." CW Br. 27. But the authority just cited spans the gamut. The unions' contrary argument misreads the law, confusing the "anticompetitive conduct" element with the "anticompetitive effects" elements of a rule of reason claim.

Exclusive dealing claims require both ubiquity of the practice (conduct) and a restriction of rival output (effects). Exclusive contracts lock up customers' *demand* for the life of the contract.

But "virtually every contract to buy 'forecloses' or 'excludes' alternative sellers from some portion of the market." *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983). Competing for the contract is not illegal; it is "a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010); *Paddock Publ'ns, Inc. v. Chicago Trib. Co.*, 103 F.3d 42, 45 (7th Cir. 1996) (Easterbrook, J). The *conduct* element, therefore, requires evidence of ubiquity—allegations that rivals have been "substantially foreclosed" from all meaningful sales opportunities. This is usually expressed as the ***demand foreclosure percentage***—does the exclusive lock-up 1% of the market or 90%? In bygone years, amid greater judicial hostility to exclusivity, the analysis stopped there. *McWane v. FTC*, 783 F.3d 814, 835 (11th Cir. 2015). But courts now recognize that, demand "foreclosure is no longer sufficient by itself [to show] anticompetitive *harm,*" or effects. *Id*. So they require, as part of the "anticompetitive effects" element, proof of *supply foreclosure*, or "direct evidence that the challenged conduct has affected … output." *Id*.

Other types of vertical restraints also require anticompetitive conduct and effect. The conduct test is tailored to the practice; the effects test is the same for all. Some practices – like resale price maintenance – don't depend on *demand* foreclosure at all. Each practice has its own test, like the "discount attribution test" in bundling cases, to distinguish anticompetitive conduct from competition on the merits. But whatever the practice, the plaintiff must still show anticompetitive effects, which requires supply foreclosure. That is true in anti-steering cases too. *Amex*, 585 U.S. at 549 (because anti-steering provisions "do not prevent [rivals] from competing," the plaintiff must show that the practice caused prices to rise "by restricting output.").

*The Unions Were Not "Foreclosed."* Rather than allege competitive foreclosure – or a reduction in market output – the unions turn to semantics. "NYP is wrong," they insist, "that the All Products Clause has not foreclosed anyone from anything" because insurers were "foreclosed" from designing different networks and the unions were "foreclosed" from buying health plans that restrict provider choice. CW Br. 27. That is not *competitive* "foreclosure," either of supply or demand. Foreclosure looks to the effect on rivals – their opportunities (demand) and their ability to "peddle their wares" (supply). *Schachar*, 870 F.2d at 399. A customer – or, in the unions' case, a customer's customer – is not *foreclosed* in the antitrust sense merely because upstream conduct shapes the products available downstream. That insurers elected to maintain open networks – leaving the unions to select among plans using them – is not *competitive* foreclosure, and not enough to plausibly allege anticompetitive effects flowing from NYP's participation agreements.

## VII. CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint.[16]

---

[16] The DOJ's Statement of Interest (ECF 47), filed yesterday afternoon without leave, parrots the unions' arguments. NYP addresses those arguments herein, but reserves the right to respond separately if after further review it believes it warranted.

Dated: July 7, 2026

Respectfully submitted,

/s *Colin R. Kass*

Colin R. Kass*
KaDee L. Ru**
PROSKAUER ROSE LLP
1001 Pennsylvania Ave, N.W.
Washington, D.C. 20004
(202) 416-6800
ckass@proskauer.com
kru@proskauer.com

Vinay Kohli**
PROSKAUER ROSE LLP
2029 Century Park East
Suite 2400
Los Angeles, CA 90067

David A. Munkittrick
Reut N. Samuels
Portia S. Proctor
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
(212) 969-3000
dmunkittrick@proskauer.com
rsamuels@proskauer.com
pproctor@proskauer.com

Attorneys for The New York and
Presbyterian Hospital

*Admitted Pro Hac Vice*
**Pro Hac Vice Forthcoming*

## **WORD COUNT CERTIFICATION**

Pursuant to Local Rule 7.1(c), I hereby certify that the total number of words in this memorandum, excluding the caption, table of contents, table of authorities, signature block, and word count certification is 8, 647.

/s/ *Colin R. Kass*